## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **W&T OFFSHORE, INC.,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:14-CV-02740** |
| | § | |
| **NATIONAL LIABILITY & FIRE** | § | |
| **INSURANCE COMPANY;** | § | |
| **INDEMNITY INSURANCE** | § | |
| **COMPANY OF NORTH AMERICA;** | § | |
| **NEW YORK MARINE &** | § | |
| **GENERAL INSURANCE** | § | |
| **COMPANY; NAVIGATORS** | § | |
| **INSURANCE COMPANY; AND** | § | |
| **LIBERTY MUTUAL INSURANCE** | § | |
| **COMPANY,** | § | |
| *Defendants*. | § | |

## W&T OFFSHORE, INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT ON STARR'S AFFIRMATIVE DEFENSE NO. 17

National Liability & Fire Insurance Company ("Starr") previously moved for summary judgment on W&T Offshore, Inc.'s ("W&T") claims against Starr under Chapter 542 of the Texas Insurance Code, based on Starr's affirmative defense number 17 that argues that Chapter 542's requirements are inapplicable because of the "marine insurance" exception in Texas Insurance Code § 542.053.[1] *See* Dkt. 51.  W&T responded and argued that, if anything, W&T is entitled to

---

[1] Starr filed an amended answer, adding a new affirmative defense number 4, which changed the numbering of subsequent defenses.  Dkt. 63.  While Starr referred to the marine-insurance defense in its motion for summary judgment as defense number 16, *see* Dkt. 51, it is now Starr's affirmative defense number 17.

judgment as a matter of law on the issue.  *See* Dkt. 57.  W&T hereby cross-moves for summary judgment on Starr's affirmative defense number 17 that its excess policies are not subject to the prompt-payment and notice requirements under Chapter 542 of the Texas Insurance Code.

## SUMMARY

Chapter 542 of the Texas Insurance Code establishes a number of claims-handling and payment deadlines for insurers.  As one of its affirmative defenses, Starr seeks to avoid the consequences of its non-compliance with Chapter 542's deadlines by improperly invoking a narrowly defined exception for "marine insurance."  Yet the statute's plain language defining "marine insurance," together with its broad remedial purpose, make clear the statute excepts from Chapter 542's requirements only insurance coverage for damage to property in connection with risks from waterborne navigation or transportation.  As a matter of law, that exception does not apply to W&T's coverage for stationary, non-navigable platforms and the risks to those platforms from named windstorms.  As set forth below, the Court should grant summary judgment for W&T and hold that Starr is precluded from relying on this affirmative defense.

## FACTUAL BACKGROUND

W&T engages in oil-and-gas exploration and development in the Gulf of Mexico.  *See* Aff. of Larry Laurie ¶ 2 (attached as Ex. A).  To protect itself from

catastrophic losses from named windstorms, as relevant here, W&T purchased three types of insurance policies:  (1) a commercial general liability policy (the "Primary Policy"); (2) a series of policies applying to multiple types of losses that could arise from oil and gas assets and operations (the "Energy Package"); and (3) a series of excess liability policies covering, *inter alia*, removal of wreck and debris costs arising from oil and gas assets and operations (the "Umbrella Policies").  *See* Laurie Aff. ¶¶ 4-6; Dkt. 29 ¶¶ 10-13.  Starr is the underwriter for two of W&T's excess policies.  *See* Dkt. 29 ¶ 13; *see also* Dkt. 51, Exs. A, B (copies of policies attached to Starr's motion for summary judgment).[2]

After Hurricane Ike damaged over 150 offshore platforms in which W&T has an interest, notice was given to W&T's insurance carriers of potential claims for W&T's losses.  *See* Laurie Aff. ¶¶ 7-8; Dkt. 29 ¶ 16.  W&T received payment for the full policy limits under its Primary Policy.  *See* Laurie Aff. ¶ 8; Dkt. 29

---

[2] There are multiple versions of these Umbrella Policies because Starr attempted to "reissue" the policies after Hurricane Ike, and the parties dispute which versions are the operative policies.  But that dispute is immaterial to the legal issue presented here of whether the Umbrella Policies are "marine insurance" under the Texas Insurance Code because the relevant terms in the different versions of the Umbrella Policies are the same.  For the sake of simplicity, and without waiving its right to argue that Starr's filed versions of the Umbrella Policies are not the operative policies, W&T cites to the versions of the Umbrella Policies that Starr attached to its summary-judgment motion.  The Fifth Circuit likewise determined coverage under the Umbrella Policies without needing to resolve the dispute over which versions of the Umbrella Policies are in effect.  *See* W&T's Resp. to Starr's Pet. for Reh'g, No. 13-20512 (5th Cir.), filed July 17, 2014.

¶ 23.  W&T also received payments from the Energy Package insurers that exhausted the limits of those policies.  *See* Laurie Aff. ¶ 8; Dkt. 29 ¶ 23.

W&T still had claims for costs incurred in removing wreck and debris, which were estimated to be in excess of $42 million.  *See* Laurie Aff. ¶ 8; Dkt. 29 ¶¶ 17, 42.  After being notified of these costs, the excess insurers (the "Underwriters") filed lawsuits seeking declarations that they had no obligation to indemnify W&T for its removal of wreck and debris costs.  *See Indem. Ins. Co. of N. Am. v. W&T Offshore, Inc.*, No. 4:12-CV-02469 (S.D. Tex., filed Aug. 17, 2012) (consolidated action).  The Fifth Circuit ultimately rendered judgment for W&T, holding that the Umbrella Policies provide coverage for W&T's removal of wreck and debris costs.  *See Indem. Ins. Co. of N. Am. v. W&T Offshore, Inc.*, 756 F.3d 347, 353 (5th Cir. 2014).  That action settled Starr's obligation to cover W&T's removal of wreck and debris costs.

Although Starr's obligation to reimburse W&T for its removal of wreck and debris costs under the Umbrella Policies has been made clear, Starr still has failed to pay the full amount owed under the Umbrella Policies.  As set forth in the First Amended Complaint, W&T's claims for removal of wreck and debris have been fully adjusted by Braemar Steege, Inc. under its assignment on behalf of Underwriters, and Underwriters have had notice of the adjusted claims for years.  *See* Dkt. 29 ¶¶ 16-17, 22.  Starr has tried everything to avoid complying with its

obligations, *see* Dkt. 29 ¶¶ 19-34, including claiming to need *another* adjustment as part of a sustained effort to not pay W&T the amounts owed, *see* Dkt. 51 at 3-4.

W&T brought this action to recover its removal of wreck and debris costs, as well as other damages, interest, exemplary damages, attorneys' fees, and court costs. *See* Dkt. 29 at 14-16, 29-30. W&T also seeks statutory interest and attorneys' fees under § 542.060 of the Texas Insurance Code for Starr's failure to provide notice of its acceptance or rejection of W&T's claims, and for Starr's failure to provide prompt payment to W&T. *See* Dkt. 29 at 16-23, 29-30.

Because Starr's answer seeks to raise a number of coverage-based defenses that attempt to re-litigate the issues decided by the Fifth Circuit—or that could have been, but were not, raised in that suit—W&T has moved for summary judgment on several of Starr's defenses. *See* Dkt. 26. That motion is pending.

Starr's motion for summary judgment on W&T's Chapter 542 claims, *see* Dkt. 51, is yet another attempt by Starr to evade its obligations to W&T, *see* Dkt. 57. Summary judgment is warranted *in W&T's favor* on Starr's affirmative defense number 17 because it fails as a matter of law.

## STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986).  A court may consider any evidence in the record.  FED. R. CIV. P. 56(c)(1)(A).  However, conclusory affidavits will not suffice to create or negate a genuine issue of fact.  *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986).  The court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

Summary judgment is appropriate where, as here, the material facts are not in dispute and the issue before the Court poses a purely legal question.  *Buzek v. Pepsi Bottling Grp., Inc.*, 501 F. Supp. 2d 876, 878 (S.D. Tex. 2007) (citing *Edwards v. Aguillard*, 482 U.S. 578, 595-96 (1987)).  Issues of statutory and contractual interpretation are questions of law that may be determined by summary judgment.  *See Affiliated Computer Servs., Inc. v. Wilmington Trust Co.*, 565 F.3d 924, 928 (5th Cir. 2009); *see also Esquibel v. Chase Manhattan Bank U.S.A, N.A.*, 276 F. App'x 393, 395 (5th Cir. 2008) (per curiam) (where parties agreed there were no disputed issues of material fact, the only question was whether movant was entitled to judgment as a matter of law based on statutory interpretation).

When the parties cross-move for summary judgment, the court must review each motion independently.  *See Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010).

## **ARGUMENT**

W&T is entitled to summary judgment on Starr's "marine insurance" defense to W&T's Chapter 542 claims because, as a matter of law based on the undisputed evidence, the Umbrella Policies' coverage for removal of wreck and debris from W&T's fixed offshore platforms does not fall within the scope of the exception under § 542.053(a)(5) of the Texas Insurance Code.

**I.**    **Section 542.053(a)(5)'s Narrow Exception For Certain Marine Coverage Does Not Apply To The Umbrella Policies' Coverage For Removal Of Wreck And Debris Costs Stemming From W&T's Fixed Platforms.**

Two of W&T's claims against Starr invoke Subchapter B of Chapter 542 of the Texas Insurance Code, which governs an insurer's potential liability for failing to provide notice of its decision regarding a request for payment or for failing to promptly pay a claim within 75 days. *See* Dkt. 29 at 16-20, 20-23; TEX. INS. CODE §§ 542.056, 542.058(a), 542.059. Chapter 542 of the Texas Insurance Code does not apply, however, to certain insurance coverage, including "marine insurance as defined by Section 1807.001 of the Insurance Code." *See* TEX. INS. CODE § 542.053(a)(5). Section 1807.001(2) defines "marine insurance" as:

(A)    insurance and reinsurance that covers:

(i)    loss or damage to:

(a)    a hull, vessel, or craft of any kind, an aid to navigation, a dry dock, or a marine railway, whether complete, under construction, or awaiting construction; or

(b)    insurable property and interests in respect to, appertaining to, or in connection with a risk or peril of navigation, transit, or transportation:

(1)    on or under a sea, lake, or river or other water, in the air, or on land in connection with or incident to export, import, or waterborne risks;

(2)    while being assembled, packed, crated, baled, compressed, or similarly prepared for shipment;

(3)    while awaiting shipment; or

(4)    during delay, storage, or transshipment or reshipment incident to the initial shipment;

(ii)    a marine builder or repairer risk;

(iii)    a marine protection or indemnity risk; or

(iv)    a war risk regarding any insurable property or interest described by this section; and

(B)    insurance defined as marine insurance by another statute, lawful custom, or rule adopted by the commissioner.

TEX. INS. CODE § 1807.001(2).

In its affirmative defense number 17, Starr argues that the Umbrella Policies are "marine insurance" as defined above, thus precluding W&T's prompt-payment and notice claims under Chapter 542. *See* Dkt. 63 at 20. None of the provisions above, however, can reasonably be read to apply to the Umbrella Policies.

Whether § 1807.001(2) applies to the Umbrella Policies turns on the coverage provided. *Cf. Folksamerica Reinsurance Co. v. Clean Water of N.Y.,*

*Inc.*, 413 F.3d 307, 317 (2d Cir. 2005) (in distinct context of deciding if federal admiralty jurisdiction applies, coverage is determinative in resolving whether insurance is marine insurance). The beginning and ending of the Court's analysis should therefore be the text of the statute and the Umbrella Policies' terms for the coverage at issue. *See also Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) (plain language of statute controls).

First, the Umbrella Policies are not insurance for protection or indemnity, or "P&I" policies, under § 1807.001(2)(A)(iii). P&I insurance is a catch-all covering the risks that hull and cargo policies do not reach. *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500, 503 & n.2 (2d Cir. 1972); *see also* 2 Schoenbaum, ADMIRALTY & MAR. LAW § 19-12 ("Protection and Indemnity insurance today covers virtually all the risks not covered by hull insurance.") (5th ed. 2015). P&I insurance came into common use after English law established that collision liability was not a "peril of the sea" and thus not covered under the basic marine insurance policy. 2 Schoenbaum, ADMIRALTY & MAR. LAW § 19-12. Thus, P&I insurance is a gap-filler for coverage of a vessel and the incident marine risks thereto.

Second, as to § 1807.001(2)(A)(i), the relevant text excepts from Chapter 542's requirements insurance coverage for damage to property or interests in connection with risks or perils from waterborne navigation, transit, or

transportation. *See* TEX. INS. CODE § 1807.001(2)(A)(i)(b)(1). By its terms, the exception plainly applies only to coverage for property that is in connection with a risk of *navigation, transit, or transportation* over water—*i.e.*, the movement (or movement of something) from one place to another over water—not every property that happens to relate to water. *See, e.g.*, *Navigation*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The act of sailing vessels on water" or "the process and business of directing the course of a vessel from one place to another."); *Transportation*, *id.* ("The movement of goods or persons from one place to another by a carrier."). The exception is narrow, which is reinforced by the accompanying provisions in § 1807.001(2)(A)(i) that further except from Chapter 542 only coverage for *navigable* property, such as "vessels" or "crafts," or related "aids to navigation." *Cf. Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 497 (2005) ("vessel," for purposes of Longshore and Harbor Workers' Compensation Act, is watercraft practically capable of maritime transportation); *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 741 (2013) (structure incapable of self-propulsion, without rudder or steering mechanism, is not "vessel"; no reasonable observer would consider it designed to carry people or things over water).

Here, the Umbrella Policies' coverage for W&T's offshore platforms is not coverage for property relating to waterborne navigation or transportation. The insured "property"—W&T's platforms—are not at all engaged in waterborne

-10-

"navigation, transit, or transportation" because they are stationary, non-navigable structures used for producing and processing oil and gas. *See* Laurie Aff. ¶ 7. The platforms are not practically capable of navigation or transportation. *See id.* Indeed, such fixed offshore platforms are not even considered vessels under maritime or admiralty law. *Compare Verdin v. ENSCO Offshore Co.*, 104 F. Supp. 2d 682, 686 (W.D. La. 2000), *aff'd*, 255 F.3d 246 (5th Cir. 2001) (fixed platform is not a vessel), *with United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 490 (5th Cir. 2014) (moveable drilling rig is a vessel). Further, the relevant "risk or peril" covered by the Umbrella Policies is named windstorms, *see* Laurie Aff. ¶¶ 4, 6, which is an entirely different type of risk than those associated with navigation, transit, or transportation. The fact that the "insurable property" covered for loss or damage is not "in respect to, appertaining to, or in connection with a risk or peril of navigation, transit, or transportation" means the Texas Insurance Code's "marine insurance" exception is inapplicable here.

If there were any doubts on the question whether §§ 542.053(a)(5) and 1807.001(2)(A)(i) apply here, the Texas Insurance Code answers the question in favor of the insured. The Legislature has made clear "this subchapter shall be liberally construed to promote the prompt payment of claims." TEX. INS. CODE § 542.054. Here, construing the provisions liberally to promote the prompt payment of insurance claims means that *exceptions* to the prompt-payment

requirements must be applied narrowly. *See, e.g.*, *Harris Cnty. Appraisal Dist. v. Integrity Title Co.*, No. 01-15-00145-CV, 2015 WL 8945574, at *5 (Tex. App.—Houston [1st Dist.] Dec. 15, 2015, pet. filed). Particularly in light of this interpretive principle, the exception for coverage of property relating to risks of waterborne navigation and transportation cannot be applied to removal of wreck and debris coverage for non-navigable platforms.

In sum, as relevant here, W&T purchased coverage for damage to its fixed platforms caused by named windstorms. That is very different than coverage for "damage to…property and interests…in connection with a risk or peril of navigation, transit, or transportation" over water. TEX. INS. CODE § 1807.001(2)(A)(i)(b)(1). Chapter 542's exception does not apply here as a matter of law, warranting summary judgment in W&T's favor on Starr's affirmative defense.

## II.   <u>None Of The Arguments For Applying The Marine-Insurance Exception Here Has Merit.</u>

Disregarding the textual analysis above, Starr has argued that the Umbrella Policies qualify as "marine insurance" as defined by § 1807.001(2)(A)(i) by relying on the fact that the Umbrella Polices have "marine" written on the first page. *See* Dkt. 51 at 7-8. But the label used on a policy is irrelevant; as discussed above, *the coverage provided* is what determines the applicability of the exception to Chapter 542. *See supra* Part I. Even in the distinct context of deciding whether

insurance policies are marine policies for purposes of admiralty jurisdiction, courts have made clear that neither the form nor the title of a policy is dispositive. *See, e.g.*, *Folksamerica*, 413 F.3d at 317 ("[T]he form of—or label given to—an insurance policy will not always identify the nature of the risks the insurer assumes."). The question is what coverage is provided, and here the relevant coverage is for damage to fixed platforms from named windstorms.

Moreover, the fact that removal of wreck and debris operations can involve vessels is irrelevant to a determination of whether the Umbrella Policies are "marine insurance." Sections 542.053(a)(5) and 1807.001(2)(A)(i)(b)(1) apply where coverage is for "property" that is "in connection with a risk or peril of navigation, transit, or transportation," so the fact that the insured *property* here (*i.e.*, fixed platforms) does not relate to waterborne navigation or transportation— and was not damaged due to this type of risk or peril, but rather because of a named windstorm—is dispositive. Whether W&T or its contractors use a vessel to recover wreck and debris has no relevance to a determination of what the Umbrella Policies cover, which is the risk of damage to W&T's stationary platforms. And there can be no dispute that W&T's Umbrella Policies do not cover damage sustained by the vessels or other equipment involved in removal of wreck and debris operations. *See* Laurie Aff. ¶¶ 9-10. W&T does not even own the vessels used to perform removal of wreck and debris operations. *See id.* Because W&T's

or its contractors' use or operation of such vessels and equipment is not an insured risk for which Starr would be responsible under the Umbrella Policies' removal of wreck and debris coverage, it is irrelevant to a determination of the nature of coverage provided.

Similarly, federal law requiring removal of wreckage from navigable waters is not relevant to the question whether the Umbrella Policies' removal of wreck and debris coverage falls within § 542.053(a)(5)'s narrow exception.  W&T's excess coverage relates to stationary platforms that produce and process oil and gas, and specifically the risk that those platforms may be damaged by named windstorms.  The fact that a governmental agency may require removal of the wreckage and debris in the Gulf—for environmental reasons or even in order to avoid hazards to a vessel that *is* engaged in navigation or transportation—in no way changes the nature of the coverage for W&T's platforms or the applicability of § 542.053(a)(5).

There is also no merit to Starr's contention that the "marine insurance" exception applies because the Umbrella Policies might—apart from providing the removal of wreck and debris coverage at issue here—provide other, incidental coverages for damage to the platforms that, in some other cases, could possibly relate to waterborne navigation or transportation.  Sections 542.053(a)(5) and 1807.001(2)(A)(i)(b)(1) apply only where coverage is for "property" that is "in

connection with a risk or peril of navigation, transit, or transportation."  Here, the insured *property* is non-navigable, fixed platforms, and the relevant coverage is for risks or perils from named windstorms.

Further, even if the Umbrella Policies also cover particular types of damages that (in other cases) could relate to waterborne navigation or transportation within the meaning of Chapter 542's exception, the exception still should not apply where the only coverage at issue is for removal of wreck and debris costs to fixed platforms.  Section 1807.001(2)(A) does not apply categorically to a *policy* (a word that nowhere appears in §§ 542.053(a)(5) or 1807.001(2)(A)), but instead to insurance *coverage* that meets the statutory definition.  Any other conclusion would make the § 542.053(a)(5) exception swallow the rule by allowing insurers to avoid Chapter 542's requirements simply by including extraneous, incidental coverages in their policies.  Here, for example, the Umbrella Policies sit in excess of a variety of policies and coverages, including auto coverage, aviation liability, commercial general liability, and employers' liability.  *See* Laurie Aff. ¶ 6.  Where policies primarily cover non-marine risks, the fact that the policies might theoretically also provide incidental coverage for a marine-related loss or damage to insured property should not transform them into "marine insurance" under Chapter 542.  Otherwise, Chapter 542's purpose to promote the prompt payment of claims would be frustrated.  *See* TEX. INS. CODE § 542.054.

The plain terms of the statutory definition of "marine insurance" make clear that it concerns only property relating to waterborne navigation and transportation, not fixed offshore platforms. TEX. INS. CODE § 1807.001(2)(A)(i)(b)(1). The "marine insurance" exception does not apply to the Umbrella Policies, Starr is not exempt from Chapter 542's requirements, and W&T is entitled to summary judgment on this affirmative defense.

## III.    Even Analogous Case Law Supports Concluding That The Umbrella Policies Are Not Marine Insurance.

There is no authority holding that the Texas Insurance Code's definition of "marine insurance" includes coverage for removal of wreck and debris costs from fixed platforms. Two federal cases address § 542.053(a)(5), but neither is factually relevant here. In one case, the Fifth Circuit unsurprisingly held that salvage costs for a *ship* that sunk at a dockyard fell within the exception for "a marine builder or repairer risk," which is not even arguably applicable here. *See Nat'l Liab. & Fire Ins. Co. v. R&R Marine, Inc.*, 756 F.3d 825, 837 (5th Cir. 2014). And in the second, a district court concluded that the cargo insurance policy at issue covered the "waterborne risk of exporting beef to Chile," and therefore was a marine insurance policy under Chapter 542. *See Beef Source Int'l, LLC v. Certain Underwriters at Lloyd's London*, No. 2:14-CV-104-J, 2015 WL 5666716, at *3 (N.D. Tex. Sept. 24, 2015). The facts here are readily distinguishable because

W&T's removal of wreck and debris coverage for its platforms does not insure seafaring vessels or cargo transportation.

Starr, lacking any authority holding that removal of wreck and debris coverage for fixed platforms is "marine insurance" under § 1807.001(2)(A), instead has relied on case law from secondary contexts. *See* Dkt. 51 at 7-9. For instance, Starr pointed to some admiralty-jurisdiction cases to argue that the Umbrella Policies are maritime contracts and apparently should therefore be considered marine insurance. *See id.* Starr's reliance is misplaced because the test for determining the boundaries of admiralty jurisdiction over contracts—*i.e.*, whether a contract is "maritime" in nature—is broader than, and cannot control, determination of whether insurance coverage falls within the Texas Insurance Code's narrow definition of "marine insurance." Regardless, Starr is incorrect in how that test would apply here because, to the extent admiralty-jurisdiction cases and other such secondary authority can provide guidance here, that guidance only illustrates why the Umbrella Policies are not marine insurance.

Some authority, though not involving the definition of "marine insurance" under the Texas statute, explains what marine insurance is generally and the purpose it serves, and that authority further supports W&T. Marine insurance has historically protected seafarers against the perils of marine adventure; for example, the Supreme Court has said that marine insurance is a "guaranty on the part of the

insurer, that the ship or goods shall pass safely over the sea, and through its storms and its many casualties, to the port of its destination; and if they do not pass safely, but meet with disaster from any of the misadventures insured against, the insurer will pay the loss sustained." *N.E. Mut. Marine Ins. Co. v. Dunham*, 78 U.S. 1, 30 (1870) (analyzing whether suit to recover for loss brought under marine insurance policy triggered admiralty jurisdiction).   Stated more simply, marine insurance protects ships and their cargo. *See* Schoenbaum, 2 ADMIRALTY & MAR. LAW § 19-1 (5th ed. 2015) (noting the "three principal categories of marine insurance policies": hull insurance, cargo insurance, and protection and indemnity (P&I) insurance to insure against third-party and other liabilities not covered by the hull policy).   This traditional view of marine insurance bolsters the Texas Insurance Code's definition that applies to risks from waterborne movement and that thus references, *inter alia*, hulls, vessels, freights, and cargoes.   *See* TEX. INS. CODE § 1807.001(2)(A)(i).

Moreover, even if one applies cases analyzing the existence of admiralty jurisdiction, W&T would still be entitled to summary judgment because the Umbrella Policies are not maritime contracts.   As the Supreme Court has instructed, whether a contract is maritime "depends upon…the nature and character of the contract," and the true criterion is whether it has "reference to maritime service or maritime transactions."   *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24

(2004) (internal quotations omitted); *see also id.* at 25 ("We have reiterated that the fundamental interest giving rise to maritime jurisdiction is the protection of maritime *commerce*.") (internal quotations omitted; emphasis original).  In *Kirby*, the contracts at issue were held to be maritime contracts because their "primary objective" was to "accomplish the transportation of goods by sea."  *See id.* at 24.

Here, by contrast, the "primary objective" of the Umbrella Policies is to insure against damage to W&T's fixed platforms.  *See* Laurie Aff. ¶¶ 4, 6.  There is nothing in the Umbrella Policies that concerns maritime service or maritime transactions, much less maritime *commerce*.

Courts applying *Kirby* have found that contracts even more closely connected to marine concerns than the Umbrella Policies—including those incidentally involving boats or marine-adjacent property—are not maritime in nature.  For example, in *New Hampshire Insurance Co. v. Home Savings & Loan Co.*, the Sixth Circuit held that an insurance policy covering a yacht dealership and marina—but that expressly excluded water crafts—was not maritime in nature, even if some of the services provided by the marina may relate incidentally to or facilitate maritime commerce.  *See* 581 F.3d 420, 429, 431 (6th Cir. 2009).  The court rejected a simple geographic analysis, instead relying on "a conceptual distinction between a contract relating to a particular vessel involved in a commercial operation as opposed to the overarching operation of a fixed structure

that happens to involve boats." *Id.* at 431. Under this reasoning, the Umbrella Policies are plainly not maritime because their "primary objective"—to reimburse for costs incurred from damage to W&T's fixed platforms—does not relate to maritime transactions or services.[3] The admiralty-jurisdiction cases provide no support for an argument that the Umbrella Policies are maritime contracts.

## CONCLUSION

The Umbrella Policies' removal of wreck and debris coverage, and the statutory definition of "marine insurance," make clear that Starr is not exempt from the requirements in Chapter 542 of the Texas Insurance Code. Accordingly, W&T prays that this Court grant summary judgment on Starr's affirmative defense number 17. W&T also prays for such further relief to which it is entitled.

---

[3] This case is therefore readily distinguishable from cases involving contracts that concern vessel coverage, which have been held to be maritime in nature for purposes of finding admiralty jurisdiction. *See St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of the Port of New Orleans*, 418 F. App'x 305, 308 (5th Cir. 2011) (per curiam) (policy insuring fourteen vessels held to be maritime contract); *Taylor v. Lloyd's Underwriters of London*, 972 F.2d 666, 668 n.5 (5th Cir. 1992) (policy insured against certain maritime risks and losses). *See also Alex v. Wild Well Control, Inc.*, No. 07-9183, 2009 WL 2599782, at *9 (E.D. La. Aug. 18, 2009) (applying six-factor test to determine whether employment contract for crew member on vessel was maritime contract); *Harrington v. United States*, 748 F. Supp. 919, 928 (D. Puerto Rico 1990) (analyzing whether *tort* claims asserted by crew members of ship against Coast Guard were maritime).

Respectfully submitted,

*/s/ Warren W. Harris*

Fred Hagans
Attorney-in-charge
State Bar No. 08685500
Southern District Bar No. 2457
fhagans@hagans-law.com
HAGANS BURDINE MONTGOMERY
   & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, Texas 77006
Telephone:  (713) 222-2700
Facsimile:   (713) 547-4950

Warren W. Harris
State Bar No. 09108080
Southern District Bar No. 11318
warren.harris@bracewelllaw.com
Jeffrey L. Oldham
State Bar No. 24051132
Southern District Bar No. 924613
jeff.oldham@bracewelllaw.com
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone:  (713) 221-1490
Facsimile:   (713) 221-2199

OF COUNSEL:

Scott G. Burdine
State Bar No. 03368900
Southern District Bar No. 10148
sburdine@hagans-law.com
William G. Hagans
State Bar No. 24055612
Southern District Bar No. 695531
whagans@hagans-law.com
HAGANS BURDINE MONTGOMERY & RUSTAY, P.C.

3200 Travis, Fourth Floor
Houston, Texas 77006
Telephone:   (713) 222-2700
Facsimile:    (713) 547-4950

Matthew S. Parish
State Bar No. 24014279
Southern District Bar No. 25140
mparish@tsslawfirm.com
Keith R. Taunton
State Bar No. 19681100
Southern District Bar No. 5372
ktaunton@tsslawfirm.com
TAUNTON SNYDER & SLADE
10370 Richmond Avenue, Suite 1400
Houston, Texas 77042
Telephone:   (713) 961-5800
Facsimile:    (713) 993-2308

**Attorneys for Plaintiff W&T Offshore, Inc.**

March 17, 2016

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served a copy of W&T Offshore, Inc.'s Motion for Summary Judgment On Starr's Affirmative Defense No. 17 in electronic form on counsel of record by filing it using the Court's CM/ECF system on the 17th day of March 2016.

/s/ <i>Warren W. Harris</i>

Warren W. Harris

#5108734.7

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **W&T OFFSHORE, INC.,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:14-CV-02740** |
| | § | |
| **NATIONAL LIABILITY & FIRE** | § | |
| **INSURANCE COMPANY;** | § | |
| **INDEMNITY INSURANCE** | § | |
| **COMPANY OF NORTH AMERICA;** | § | |
| **NEW YORK MARINE &** | § | |
| **GENERAL INSURANCE** | § | |
| **COMPANY; NAVIGATORS** | § | |
| **INSURANCE COMPANY; AND** | § | |
| **LIBERTY MUTUAL INSURANCE** | § | |
| **COMPANY,** | § | |
| *Defendants.* | § | |

## AFFIDAVIT OF LAWRENCE ("LARRY") FRANK LAURIE, JR.

1.      My name is Lawrence ("Larry") Frank Laurie, Jr.  I am over the age of twenty-one years.  I have never been convicted of a felony and am competent to make this affidavit.  All of the facts contained herein are true and correct and all are within my personal knowledge.

2.      I am the Risk Manager for W&T Offshore, Inc. ("W&T"), which engages in oil-and-gas exploration and development in the Gulf of Mexico.

3.      I have held the position of Risk Manager since May 2007.  My job responsibilities currently include securing and maintaining appropriate policies of insurance applicable to W&T's activities, including those policies that provide coverage for offshore assets in which W&T maintains a working interest.  As part of the foregoing, I, on behalf of W&T, provide input on and participate in negotiating the insurance policies to be purchased, including the coverages, terms, conditions, and limits of such policies.  Additionally, I am also responsible for reporting, facilitating, and monitoring claims made under W&T's policies of insurance.  As a result of these responsibilities, I have personal knowledge of the

policies of insurance and the claims W&T has made relating to W&T's offshore assets damaged by Hurricane Ike.

4.     I assisted W&T in the purchase of Policy Nos. MS-S 2812, 2813, 2814, 2815, and 2816.  Policy No. 2812 provides 50% of the first $50 million above W&T's $10 million self-insured retention ("SIR") for Named Windstorm claims. Policy No. 2813 provides the remaining 50% of the first $100 million above W&T's SIR.  Policy Nos. 2812 and 2813 provide essentially identical coverage, including coverage for Operator's Extra Expense, Property Damage, and Removal of Wreck and Debris ("ROW/D") claims, as it relates to W&T's losses arising from Hurricane Ike.  But, as noted above, the policies differ in their limits.  These policies are designated "Energy Package" policies.  Policy Nos. 2814, 2815, and 2816 are designated "Excess Named Windstorm" policies.  Policy Nos. 2814 and 2815 together provide 50% of $50 million above the initial $50 million afforded by Policy No. 2812.  Policy No. 2816 provides an additional $50 million in coverage above $100 million. As it relates to Named Windstorm claims, W&T for ease of reference refers to all of the aforementioned policies, both the Energy Package and Excess Named Windstorm policies, as its "Energy Package."

5.     I also assisted W&T in procuring a Commercial General Liability Policy, Policy No. MS-S 2773 (the "General Liability Policy").  The General Liability Policy includes a grant of coverage for ROW/D claims.

6.     I also assisted W&T in procuring several Excess Liability Policies, including Policy Nos. MS-S 2774, 2775, 2776, and 2777 (collectively, the "Umbrella Policies").  W&T purchased the Umbrella Policies to provide additional limits of coverage for a variety of claims.  The Umbrella Policies are "excess" of W&T's General Liability Policy and the Energy Package.  The Umbrella Policies provide excess liability over a number of different coverages, including commercial general liability, employers' liability, maritime employers' liability, business automobile liability, Charterer's liability, and aviation liability.     The Umbrella Policies also include coverage for ROW/D claims.

7.     In 2008, Hurricane Ike damaged over 150 offshore platforms in which W&T had an interest. These platforms were stationary platforms that were not practically capable of transportation, transit, or navigation.

8.     Notice was given to all of W&T's insurance carriers of potential claims for the losses to its damaged platforms, including notice that it would seek reimbursement of ROW/D costs from the insurers on the Umbrella Policies. Eventually, W&T received payment for the full policy limits available under the

General Liability Policy and the Energy Package.   Reimbursement was also requested for outstanding ROW/D costs that W&T had incurred as a result of Hurricane Ike, which, as of March 13, 2014, totaled in excess of $42 million.

9.     The Umbrella Policies' ROW/D coverage does not include coverage of the vessels, equipment, or contractors that are used to perform ROW/D operations. W&T does not own the vessels, equipment, or contractors used to perform ROW/D operations.  The coverage provided by the Umbrella Policies' ROW/D section is to reimburse W&T for costs incurred in removing wreck and debris from W&T's fixed platforms.

10.    The Umbrella Policies are not excess of any marine cargo policy or any "Protection and Indemnity" policy for vessels.  Indeed, W&T does not own any vessels, so it does not have a Protection and Indemnity policy for vessels.

Further Affiant sayeth not.

_____
Larry Laurie


## VERIFICATION

STATE OF TEXAS                          §

COUNTY OF HARRIS                   §

        SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this 17th day of March 2016, to certify which witness my hand and seal of office.

NOTARY PUBLIC – STATE OF TEXAS

ARGELIA CISNEROS
My Commission Expires
July 29, 2016

#5109816.6

-3-