IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| W&T OFFSHORE, INC., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | C. A. No. 4:14-CV-02740 |
| | § | |
| NATIONAL LIABILITY & FIRE | § | |
| INSURANCE COMPANY ET AL., | § | |
| *Defendants.* | § | |

---

**W&T OFFSHORE, INC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' LIABILITY
FOR BREACH OF CONTRACT AND ON DEFENDANTS' RELATED
COVERAGE OR PAYMENT DEFENSES**

---

Warren W. Harris
Jeffrey L. Oldham
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone:  (713) 221-1490
Facsimile:   (713) 221-2199

Matthew S. Parish
Keith R. Taunton
TUCKER TAUNTON SNYDER & SLADE
10370 Richmond Avenue, Suite 1400
Houston, Texas 77042
Telephone:  (713) 961-5800
Facsimile:   (713) 993-2308

Fred Hagans
Attorney-in-charge
State Bar No. 08685500
Southern District Bar No. 2457
fhagans@hagans-law.com
Scott G. Burdine
William G. Hagans
HAGANS BURDINE MONTGOMERY
 & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, Texas 77006
Telephone:  (713) 222-2700
Facsimile:   (713) 547-4950

*Attorneys for Plaintiff W&T Offshore, Inc.*

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...................................................................... ii

**SUMMARY** ..........................................................................................1

**FACTUAL BACKGROUND** ..................................................................2

**SUMMARY OF THE ARGUMENT** ......................................................4

**ARGUMENT AND AUTHORITIES** .......................................................5

   I.   W&T Is Entitled To Summary Judgment Against Starr As To Breach-Of-Contract Liability............................................................................6

   II.   No Debris-Removal Sublimit Applies To W&T's Claims Under The Umbrella Policies. .............................................................................10

   III.  W&T Has Provided All Proof Of Loss Necessary To Determine The Extent Of Starr's Payment Obligations...........................................................14

   IV.  W&T's Removal Of Wreck And Debris Costs Fall Within The Coverage Provided By The Umbrella Policies. ................................................17

   V.   W&T Is Also Entitled To Summary Judgment On Liability For Breach Of Contract And On Related Defenses As To The Other Underwriters. .................20

**CONCLUSION AND PRAYER** ..........................................................**20**

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789 (5th Cir. 2010) .....................18

*Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512 (5th Cir. 2012) (per curiam)...................................................................................18

*Data Specialties, Inc. v. Transcon. Ins. Co.*, 125 F.3d 909 (5th Cir. 1997). .............6

*Fiess v. State Farm Lloyds*, 202 S.W.3d 744 (Tex. 2006).......................................11

*Indem. Ins. Co. of N.A. v. W&T Offshore, Inc.*, 756 F.3d 347 (5th Cir. 2014)…….. .................................................................................................... 3, 8, 10, 11

*Southland Lloyds Ins. Co. v. Cantu*, 399 S.W.3d 558 (Tex. App.—San Antonio 2011, pet. denied) ...................................................................................7

*Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453 (5th Cir. 2003) ..........6

*Watson v. Allstate Tex. Lloyd's*, 224 F. App'x 335 (5th Cir. 2007) (per curiam) .....6

**Regulations**

30 C.F.R. § 250.101(a)..............................................................................18

30 C.F.R. § 250.1703(b)–(e)......................................................................18

Plaintiff W&T Offshore, Inc. ("W&T") moves for summary judgment on liability for breach of contract by Defendants National Liability & Fire Insurance Company ("Starr"), Indemnity Insurance Company of North America ("IINA"), New York Marine & General Insurance Company ("New York Marine"), and Navigators Insurance Company ("Navigators") (collectively, "Underwriters"), as well as on Underwriters' affirmative defenses (specified below) that deny the satisfaction of all condition precedents to payment or that raise coverage-interpretation arguments against liability.

## SUMMARY

This lawsuit arises out of the failure by Underwriters to pay claims by W&T under a series of umbrella policies covering W&T's costs for removal of wreckage and debris ("ROW/D") in the aftermath of Hurricane Ike. The evidence is clear that Starr—which has the next policy in W&T's series with Underwriters—is liable for breach of contract because Starr's policy plainly covers W&T's ROW/D costs (as the Fifth Circuit has already held), and W&T has met all conditions precedent to payment. Starr contends in its defenses #1, 2, and 4 that W&T is required to meet a ROW/D sublimit or retention before triggering ROW/D coverage, that W&T failed to provide proof of loss, and that W&T's costs were not "compulsory by law," but these arguments—which could have been raised in prior litigation—are meritless and contrary to the undisputed facts. Likewise, the other Underwriters are liable for

breach of contract as to their respective policies, and their defenses lack merit. The

Court should grant partial summary judgment for W&T as to Underwriters' liability

for breach of contract and as to Underwriters' related defenses.

## FACTUAL BACKGROUND

### *The Parties' Excess-Insurance Policies and W&T's Loss*

W&T, an offshore oil and gas exploration and development company,

obtained from Underwriters a series of excess-insurance policies—Nos. MS-S 2774,

MS-S 2775, and MS-S 2776 (the "Umbrella Policies")[1]—that provide W&T with,

*inter alia*, reimbursement for ROW/D costs.[2] In September 2008, W&T incurred

substantial damages to its offshore assets during Hurricane Ike and notified

Underwriters of potential claims for loss.[3] Underwriters were informed that costs

from W&T's ROW/D operations would be in the range of $60-70 million.[4]

---

[1] The policies all contain the same key language, so—for convenience—W&T cites only to policy No. 2774, attached as Ex. 1. There are several different versions of policy No. 2774 and the parties disagree about which version controls, but solely for purposes of this motion—and without waiving W&T's right to argue that the bound May 1, 2008 version controls—W&T cites to the January 2009 version that Starr attached to a prior summary-judgment motion. *See* Dkt. 51, Ex. A. W&T is entitled to judgment on the issues presented here, as a matter of law, even if Starr's preferred version of the policy were to control.

[2] W&T's First Amended Complaint at 4-5 (Dkt. 29).

[3] *Id.* at 5-6.

[4] Initial Advice MS-S 2774 at 1 (MSWT 037663-65), attached as Ex. 2.

## *The Declaratory Judgment "Coverage" Action*

In August 2012, before W&T made a claim for its ROW/D costs, Underwriters brought declaratory judgment actions claiming that such costs were not covered by the Umbrella Policies.[5] W&T counterclaimed, seeking declarations that the Umbrella Policies would cover its ROW/D costs.[6] The Fifth Circuit ultimately entered judgment in favor of W&T in June 2014, holding that the Umbrella Policies provide coverage for W&T's ROW/D costs and that, upon satisfaction of W&T's self-insured retention and underlying insurance specified in the policies, Underwriters must reimburse W&T for its incurred ROW/D costs.[7]

## *Underwriters' Renewed Attempt Here to Avoid the Fifth Circuit's Judgment*

W&T filed this suit to require Underwriters to pay W&T's claims under the Umbrella Policies. Among W&T's causes of action is a breach-of-contract claim.[8] This claim initially alleged breach as to each Umbrella Policy (Nos. 2774, 2775, and

---

[5] *See IINA et al. v. W&T Offshore, Inc.*, No. 4:12-CV-02469 (S.D. Tex.) (Hoyt, J., presiding).

[6] W&T's Orig. Answer to Plaintiff [Starr's] Complaint and Declaratory J. and Counterclaim at 5 (No. 4:12-CV-02469, Dkt. 42).

[7] *Indem. Ins. Co. of N.A. v. W&T Offshore, Inc.*, 756 F.3d 347, 355 (5th Cir. 2014); *see also* W&T's Br. in Support of its Mot. for Partial Summ. J. at 4 (No. 4:12-CV-02469, Dkt. 51); W&T's Answer & Declaratory J. Counterclaim at 6 (No. 4:12-CV-02469, Dkt. 42).

[8] W&T's First Amended Complaint at 14-16 (Dkt. 29).

2776), but because Starr and another Underwriter paid the $10 million policy limits due on Policy 2774 shortly after suit was filed,[9] this claim now applies only to Nos. 2775 and 2776—which Underwriters refuse to pay. Starr denies liability for breach of contract, asserts in defense #1 that W&T cannot recover "because it cannot show that it satisfied all conditions precedent to coverage" (on the basis that because W&T failed to exhaust an alleged ROW/D sublimit), argues in defense #2 that Starr cannot determine a loss amount from W&T's proof, and alleges in defense #4 that the ROW/D costs were not "compulsory by law."[10] The other Underwriters also deny breach-of-contract liability and repeat the proof-of-loss defense.[11]

## SUMMARY OF THE ARGUMENT

The Court should grant summary judgment that all Underwriters are liable for breach of contract, and preclude Underwriters from relying on those defenses seeking to defeat their obligation to provide coverage and pay W&T's claims.

As to Starr, the evidence is clear that W&T's ROW/D costs are covered by the Umbrella Policies (as the Fifth Circuit has held) and that W&T has satisfied all requirements for obtaining payment. Yet Starr refuses to pay its portion of the next

---

[9] W&T's First Amended Complaint at 13 (Dkt. 29).

[10] Dkt. 63 at 14-17.

[11] *See* Dkt. 13 at 13 ¶¶ 1, 2 (Navigators' answer); Dkt. 14 at 13 ¶¶ 1, 2 (New York Marine's answer); Dkt. 15 at 13 ¶¶ 1, 2 (IINA's answer).

excess layer, Policy 2775. Further, contrary to Starr's defense #1, there is no sublimit for ROW/D costs; neither the Umbrella Policies nor the underlying Energy Package imposes a ROW/D sublimit or retention for claims arising from a named windstorm. W&T is also entitled to summary judgment on Starr's defenses #2 and 4 because W&T has submitted all proof needed to support its claim, and the evidence and law show that W&T had to remove debris relating to its destroyed or damaged platforms.

Likewise, the evidence conclusively proves the other Underwriters are liable for breach of contract because there is coverage for W&T's ROW/D costs, those Underwriters have been provided with sufficient proof of loss, and those Underwriters have not paid their amounts due under policy Nos. 2775 and 2776. Their defenses likewise are without merit.

## ARGUMENT AND AUTHORITIES

Because Starr and another Underwriter paid the amounts due under policy No. 2774, payment is now due from the next excess layer, Starr's policy No. 2775. Because this policy covers ROW/D costs in excess of W&T's underlying insurance (as the Fifth Circuit has held), and because the evidence conclusively proves W&T has met the only conditions to payment, W&T is entitled to summary judgment that Starr is liable for breach of contract. *See infra* Part I. None of Starr's interpretive defenses can avoid summary judgment. *See infra* Parts II–IV. And the evidence likewise conclusively proves the other Underwriters are liable for breach of contract

and have no valid defenses as to the amounts they owe under policy Nos. 2775 and 2776. *See infra* Part V. There are no genuine issues of material fact, and W&T is entitled to relief as a matter of law on these issues.

## I.    W&T Is Entitled To Summary Judgment Against Starr As To Breach-Of-Contract Liability.

An insurance policy is a contract, and, as such, is governed by rules applicable to contracts generally.[12] The elements of a breach-of-contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.[13] "[F]or an insurance company to be liable for a breach of its duty to satisfy a claim presented by its insured, the insured must prove that its claim falls within the insuring agreement of the policy."[14]

Here, there is no dispute regarding the existence or validity of the Umbrella Policies.[15] W&T has performed under the contract because it paid premiums, and as

---

[12] *See Watson v. Allstate Tex. Lloyd's*, 224 F. App'x 335, 339 (5th Cir. 2007) (per curiam).

[13] *Id.*; *see also Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 465 (5th Cir. 2003) (applying Texas law).

[14] *Data Specialties, Inc. v. Transcon. Ins. Co.*, 125 F.3d 909, 911 (5th Cir. 1997).

[15] Starr does assert a fraudulent-inducement defense, and W&T has separately moved for summary judgment on that issue. *See* W&T's Mot. for Partial Summ. J. on Starr's Fraudulent Inducement Defense, filed October 3, 2016.

explained below, W&T complied with all conditions precedent and provided proof of loss to Starr.[16] There is no dispute Starr has failed to pay under policy No. 2775 and thus breached.[17] Given Starr's breach, there is also no dispute that W&T has suffered damages—indeed, substantial damages—as a result.[18]

Further, there can be no dispute about coverage of ROW/D costs. The Fifth Circuit has already held that the plain terms of Starr's policy provide excess coverage for W&T's ROW/D costs once W&T exhausts its underlying insurance. Section I, addressing "Coverage," states that Underwriters "will pay...those sums in excess of the Retained Limit that [W&T] becomes legally obligated to pay."[19] Section I also states that the "amount [Underwriters] will pay for damages is limited" by Section III,[20] and Section III.E describes the "Retained Limit"—*i.e.*, the point after which coverage begins—in pertinent part as "[t]he total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable

---

[16] *See infra* Parts II–IV.

[17] *See Southland Lloyds Ins. Co. v. Cantu*, 399 S.W.3d 558, 568 (Tex. App.—San Antonio 2011, pet. denied).

[18] This motion does not seek summary judgment as to the amount of damages.

[19] Ex. 1 at 14; *see also W&T Offshore*, 756 F.3d at 353. It is undisputed that each of the Umbrella Policies includes an endorsement that makes clear the coverage grant includes costs incurred by W&T for ROW/D operations. *See* Ex. 1 at 49.

[20] Ex. 1 at 14; *see also W&T Offshore*, 756 F.3d at 353.

limits of any other underlying insurance."[21]

By defining the "Retained Limit" as W&T's total underlying insurance, and by stating Underwriters "will pay…those sums in excess of the Retained Limit," Sections I and III.E make clear the Underwriters' duty to reimburse W&T for covered losses and the policies' specific "attachment point." And it is undisputed that W&T's total insurance underlying the Umbrella Policies is $161 million: a $10 million self-insured retention, a $150 million named windstorm coverage under a series of energy package policies ("Energy Package"), and a $1 million commercial general liability policy ("CGL Policy").[22]

Thus, as the Fifth Circuit held, the Umbrella Policies' plain terms trigger Underwriters' duty to pay claims for ROW/D costs when W&T has incurred "sums in excess of the $161 million of underlying insurance"—without any other limits on coverage or qualifications regarding how the underlying insurance is used.[23]

The undisputed evidence also conclusively proves that W&T has incurred costs in excess of the Retained Limit for each of W&T's Umbrella Policies at issue.

---

[21] Ex. 1 at 15-16; *see also W&T Offshore*, 756 F.3d at 353.

[22] Ex. 1 at 11; Policy No. MS-S 2812 ("Energy Package") (No. 4:12-CV-02469, Dkts. 51-2 & 51-3) (Because the Energy Package policy is not continuously paginated, W&T refers to the PDF pagination), attached as Ex. 3; *see also W&T Offshore*, 756 F.3d at 353.

[23] *W&T Offshore*, 756 F.3d at 352-53.

After Hurricane Ike damaged more than 150 of W&T's offshore platforms, W&T spent over $248 million to address the damages, incurring costs associated with plugging and abandoning wells, repairing damaged platforms, and removing platforms that were destroyed or otherwise not capable of repair.[24] W&T spent more than $42 million specifically for ROW/D operations.[25]

To address these losses, W&T satisfied its $10 million self-insured retention under the Energy Package,[26] then the Energy Package insurers paid $150 million for W&T's costs incurred, including $1,152,177 in ROW/D expenses, exhausting the limits of W&T's named windstorm policies.[27] W&T's CGL Policy insurer likewise paid the $1 million limit of that policy.[28] These undisputed facts show that the "Retained Limit" of W&T's policies were met, triggering coverage.

After W&T filed this suit, Starr and another Underwriter paid $5 million each to reimburse W&T for part of its ROW/D costs, exhausting the limits of policy

---

[24] *See* Eighteenth and Final Report to Policy MS-S 2816 at 4, attached as Ex. 4.

[25] *See* Dkt. 73, Ex. A ¶¶ 7-8; Fifth and Final Report to Policy No. MS-S 2775 at 7 (Bramear257016-27), attached as Ex. 5.

[26] *See* First Report to Policy MS-S 2812 at 11 (Bramear257016-27), attached as Ex. 6.

[27] *See* Status Advice of 2 April 2015 to Policy MS-S 2776 at 3 (MSWT125585-88), attached as Ex. 7; *Also see* Dkt. 73, Ex. A ¶ 8.  Also see Depo. of Todd Grabois, 46:18-47:6, attached as Ex. 8.

[28] *See* Ex. 5 at 5-8; Ex. 8 at 46:18-47:16.

No. 2774.[29] That means all insurance providing coverage to W&T that underlies Policy 2775 has been exhausted, and that the limits of Policy 2775 will be exhausted. Underwriters subscribing to Policy 2775 were notified of their duty to pay and were provided with sufficient proof of loss.[30] Starr's duty to pay the amount it owes under Policy 2775 has been triggered. The Court should grant summary judgment that Starr is liable for breach of contract.

## II. No Debris-Removal Sublimit Applies To W&T's Claims Under The Umbrella Policies.

Contrary to the Umbrella Policies' text—*and* the Fifth Circuit's coverage ruling[31]—Starr argues that, before coverage is triggered, W&T must not only exhaust its $161 million of underlying insurance, but also satisfy an independent debris-removal sublimit.[32] However, the Umbrella Policies do not have any debris-removal sublimit or retention, and Starr's contrary position would require the Court

---

[29] *See* Liberty's Motion to Dismiss Pursuant to Rule 12(b)(b) (Dkt. 10) at 5-6; and also Depo. of Paul Ferguson (Jan. 8, 2016), 63:20-65:20, attached as Ex. 9.

[30] *See infra* Part III.

[31] *See W&T Offshore,* 756 F.3d at 353 ("Underwriters are obligated to pay 'sums in excess of' the 'total of the applicable limits of the underlying policies listed,' *i.e.*, sums in excess of the $161 million of underlying coverage.").

[32] Dkt. 63 at 14-15 ¶ 1 (alleging "W&T failed to exhaust the required $10 million retention of debris removal costs, whether or not insured or uninsured, and failed to meet the applicable retentions, limits and sublimits of the excess policies").

to improperly re-write the parties' contract.[33] Texas law is clear that "where the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction."[34]

As explained above, the relevant policy language states that W&T is entitled to coverage under its Umbrella Policies once the Retained Limit has been met, and nothing in the Umbrella Policies limits how W&T can satisfy the Retained Limit. This was the central holding of the Fifth Circuit in the coverage action.[35]

Starr now claims that "unique" language in the January 2009 version of policy No. 2774—*i.e.*, Endorsement No. 1 and a Schedule of Underlying—required W&T to meet a ROW/D sublimit and somehow limits coverage here under Policy Nos. 2775 and 2776, notwithstanding that Starr has already paid the limits of Policy 2774.[36] But Endorsement No. 1 imposed no such obligation; it just made clear the policy was excess over both W&T's CGL Policy and its Energy Package,[37] a point

---

[33] Starr also argues that the policies *should have* an ROW/D sublimit or retention, claiming fraudulent inducement as a result. Dkt. 63 at 15-17. W&T has separately moved for summary judgment on that issue. *See supra* n.15.

[34] *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) (quotation omitted).

[35] *See W&T Offshore*, 756 F.3d at 353.

[36] Dkt. 63 at 8-9, 15-17.

[37] *See* Ex. 1 at 59.

W&T has not disputed. W&T sought reimbursement only after it was clear these policies would be exhausted.[38]

Nor does the policy's reference to the "Schedules of Underlying Insurance" change anything here, *i.e.*, where the claims arise from a named windstorm.[39] Starr argues that because No. 2774 referenced a Schedule of Underlying Insurance that includes a ROW/D limit applicable to *some* claims, this limit must apply to all claims when determining if coverage is triggered. That is incorrect.

The Umbrella Policies' "Retained Limit" definition makes clear that only "applicable" limits of the underlying policies bear on W&T's excess coverage.[40] Thus, only those underlying limits that are "applicable" are material. W&T need not satisfy every limit scheduled to trigger coverage under the Umbrella Policies. For example, while the schedule lists a $1 million limit for "Charterers' Legal Liability," this limit is not "applicable" when W&T seeks recovery of ROW/D costs arising from a named windstorm.

While the underlying Energy Package does have debris-removal limits for ROW/D costs, no such limit is "applicable" here. W&T's Energy Package has four

---

[38] *See, e.g.*, Ex. 6 at 5-8.

[39] *See* Ex. 1 at 59.

[40] Ex. 1 at 16 ("Retained Limit" is "applicable limits of the underlying policies").

sections, each of which operates as a distinct insurance policy detailing its coverage terms and conditions.[41] The Energy Package provides coverage for operator's extra expense in Section 1, for physical or property damage in Section 2, for builder's risk in Section 3, and for "Named Windstorms" in Section 4.[42] Section 4 covers the same interests as Sections 1, 2, and 3 (including ROW/D), but Section 4 applies *only* to losses arising out of named windstorms—and is the *only* policy that applies to such losses because Sections 1, 2, and 3 expressly *exclude* coverage for losses arising from named windstorms.[43]

In sum, the only part of W&T's Energy Package that provided coverage for Hurricane Ike costs was Section 4, the named windstorm policy. Importantly, unlike Sections 1 and 2 (which did not provide coverage), Section 4 has no ROW/D sublimit.[44] Section 4 expressly *eliminates* any limits, sublimits, and retentions specified in Sections 1, 2, and 3.[45] The only limits or retentions specified in Section

---

[41] *See* Ex. 3 at 99 (Indicating each section is a separate insurance policy).

[42] *Id.* at 87.

[43] *Id.* at 36, 87, 136, 138, 141, 147, 153, 228.

[44] *Id.* at 36, 228. Section 2, for example, includes an ROW/D sublimit in an amount equal to 25% of scheduled value and $10 million for interest per occurrence or in the aggregate for unscheduled properties. *Id.* at 143-44. Section 1 also provides ROW/D coverage up to a "sub-limit of $10,000,000 (100%) any one Occurrence." *Id.* at 136, 149, 151.

[45] *Id.* at 36, 228.

4 are the aggregate limit of $150 million (across all Energy Package policies) and a $10 million self-insured retention.[46] As a matter of law, there is no ROW/D sublimit "applicable" here, justifying summary judgment on this defense.

### III. W&T Has Provided All Proof Of Loss Necessary To Determine The Extent Of Starr's Payment Obligations.

Starr's defense #2, which cites the policy's "When Loss is Payable" condition, is that W&T failed to provide sufficient proof of loss.[47] In fact, the evidence conclusively shows W&T provided all information necessary to allow Starr to determine the amount of loss falling within the Umbrella Policies' terms.

Starr, along with the other Underwriters, expressly approved Braemar, an independent energy loss adjuster, to adjust W&T's claim for ROW/D costs against the Umbrella Policies.[48] Braemar served as *Underwriters'* agent for the purpose of determining the extent of damage, assessing potential exposure, and adjusting W&T's claim.[49] Braemar received information from W&T supporting its claim, and Braemar would issue reports to Underwriters detailing the facts of the claims along

---

[46] *Id.* at 89.

[47] Dkt. 63 at 15 ¶ 2.

[48] *See, e.g.*, Oct. 25, 2008 Email from C. O'Connor to R. Carvell (MSWT 037236-37), attached as Ex. 7; *see also* Depo. of Pete Krouse at 61:4-7, 72:17–74:5, 192:4–193:4, attached as Ex. 11; Lillehammer Terms of Engagement, attached as Ex. 12.

[49] Ex. 10 at 11:24–12:15, 84:20–86:8, 91:3–92:13.

with Braemar's review of the documents, progress of the claim against the underlying insurance, adjustment of W&T's submissions, and verification of costs.[50] Starr has indicated it has no criticism of Braemar's adjustment of W&T's ROW/D claims.[51]

In February 2014, W&T confirmed it had given Braemar all the information related to its Hurricane Ike losses.[52] Braemar acknowledged it had all information necessary to adjust W&T's claims against its Energy Package Policies.[53] Braemar thus finalized its adjustment of W&T's claim, and its reports to Starr confirmed the Energy Package limit had "been met, fully adjusted and paid by Package Policy Insurers."[54] Braemar also detailed the payments made by the Energy Package

---

[50] *See e.g.*, Nov. 6, 2008 Initial Advice (Braemar256745-47); First Report to 2775 (Braemar256748-57); Second Report (Braemar256761-68); Third Report (Braemar256769-77); Feb. 28, 2011 Status Advice (Braemar256787-89); June 22 2011 Status Advice (Braemar 256790-93); Sept. 30 2011 Status Advice (Braemar256794-97); Feb. 27 2012 Status Advice (Braemar256808-11); Fourth Report (Braemar256818-27), attached collectively as Ex. 13; *And generally* Ex. 5.

[51] *See* Depo. of Paul Ferguson (July 15, 2016) at 96:11-17, 152:23-154:25,155:6-24, attached as Ex. 14.

[52] *See* Feb. 25, 2014 Email from R. Carvell to P. Krouse (MSWT 135252), attached as Ex. 15.

[53] Ex. 11 at 92:22-95:14, 188:15-190:4.

[54] *See, e.g.*, Ex. 5 at 5-6.

underwriters and the amounts due from the Energy Package and W&T's CGL and Umbrella Policies.[55]

According to Braemar, as of March 2014, Braemar had verified and approved $42,163,433.66 in ROW/D costs.[56] Braemar reported that the claim would exceed the limits of policy Nos. 2773, 2774, and 2775,[57] so it put forward (on W&T's behalf) requests for payment of the policy limits for those policies.[58] Additionally, Braemar made a request for the balance of the claim amount, then $15,323,776.48, to policy No. 2776.[59]

Accordingly, based on the work of Underwriters' chosen adjuster, W&T has provided Underwriters with sufficient proof of loss as a matter of law. Summary judgment is warranted on this defense and on breach-of-contract liability.

---

[55] *Id.* at 6.

[56] *Id.*

[57] *Id.*

[58] *Id.* at 8; *see also* Ex. 4 at 8.

[59] *See* Mar. 13, 2014 Fifth Report to Policy No. MS-S 2776 Insurers at 8 (Braemar 276366-74), attached as Ex. 16.

## IV.    W&T's Removal Of Wreck And Debris Costs Fall Within The Coverage Provided By The Umbrella Policies.

Starr's defense #4 is that W&T's ROW/D costs are not covered because they were not "compulsory by law."[60] Not true. The ROW/D endorsement does not itself require ROW/D costs to be "compulsory by law" or liability to be "imposed by law."[61] But even assuming that W&T's ROW/D costs are covered only if they were "compulsory by law," the Umbrella Policies, the undisputed evidence, and the law conclusively establish that W&T's ROW/D costs were compulsory by law.

The policies state that "compulsory by law" or like phrases "include obligations arising under a court order, a law, statute, proclamation, regulation, rule, or guideline issued by or under the authority of [the] government."[62] As Starr acknowledged when moving for summary judgment on its marine-insurance defense, certain federal statutes and regulations require removal of wreck and debris from the Gulf.[63] These regulations, and related guidance, establish that W&T had a

---

[60] Dkt. 63 at 17 ¶ 4.

[61] *See* Ex. 1 at 49.

[62] Ex. 1 at 49.

[63] *See* Dkt. 51 at 10; Dkt. 58 at 9; *see also* Dkt. 73 at 14 (W&T's response acknowledging that agencies may require removal of debris in certain instances, but noting that this was irrelevant to resolving whether the Umbrella Policies are "marine insurance" as defined by the Texas Insurance Code).

duty to remove those assets left destroyed or severely compromised by Hurricane Ike.

Oil and gas operations on the Outer Continental Shelf (OCS), where W&T's damaged platforms were located, must comply with the OCS Land Act, agency orders, OCS lease terms, and any other applicable laws or regulations.[64] Certain regulations govern platform removal and site clearance, and as relevant here, when an operator's facilities are "no longer useful for operations," it must permanently plug all wells, remove all platforms and facilities, decommission all pipelines, and clear the seafloor of obstructions.[65] Agency guidance documents, issued to clarify these regulations, make clear that for a platform, "no longer useful for operations" means that the platform had been toppled or otherwise destroyed, with "toppled" meaning "a platform or other structure that has collapsed or fallen or been displaced by a storm…to the extent that it is no longer visible above the water line and as a result is partially or completely destroyed."[66]

---

[64] 30 C.F.R. § 250.101(a).

[65] *See* 30 C.F.R. § 250.1703(b)–(e); *see also Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 519-20 (5th Cir. 2012) (per curiam); *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 792 (5th Cir. 2010).

[66] *See* NTL #2010-G05, Decommissioning Guidance for Wells and Platforms <https://www.bsee.gov/sites/bsee.gov/files/notices-to-lessees-ntl/notices-to-lessees/10-g05.pdf> at 2, attached as Ex. 17.

This guidance makes clear W&T incurred recoverable ROW/D costs from *at least* 17 properties. In November 2008, the Mineral Management Service (MMS) completed its assessment of damaged and destroyed facilities from Hurricanes Gustav and Ike, and listed eight properties in which W&T had an interest as "destroyed,"[67] and each of these was a total loss.[68] MMS listed three more W&T properties as "extensively damaged."[69] Braemar concluded that these properties, plus two others, were constructive total losses under W&T's policies.[70] Without repairs necessary to make the damaged platforms functional or safe, these assets were "no longer useful for operations" under the regulations and had to be removed.[71] As a matter of law, W&T's ROW/D costs were compulsory by law. Summary judgment is appropriate on this and the grounds listed above as to Starr.

---

[67] *See* Nov. 26, 2008 MMS News Release <http://www.boem.gov/boem-newsroom/press-releases/2008/press1126a.aspx>, attached as Ex. 18.

[68] *See* Ex. 6 at 3.

[69] *See* Ex. 18.

[70] *See, e.g.*, Ex. 6 at 3.

[71] The only possible exception would be approximately $344,163.39 in ROW/D costs related to platforms HI-A0379-B, ST 316 A, SS 223 B, and SS 0233 B, which were not expressly described by Braemar or an agency as damaged to the extent they are "no longer useful for operations." *See* Ex. 5 at Appendix. 1. W&T does not seek summary judgment as to these minimal ROW/D costs, but will pursue them at trial.

**V.    W&T Is Also Entitled To Summary Judgment On Liability For Breach Of Contract And On Related Defenses As To The Other Underwriters.**

All the reasons described above regarding Starr's liability for breach of contract likewise establish the other Underwriters' liability for breach of contract. The Underwriters responsible for payment along with Starr under policy No. 2775— New York Marine (33.333%) and Navigators (16.667%)—are liable for failing to pay their respective amounts owed under that policy, and those responsible for policy No. 2776—IINA (50%), New York Marine (30%), and Navigators (20%)— are liable for their proportion of approximately $15.8 million due from that policy.[72] Further, for the same reasons given above, neither the proof-of-loss defense nor the sublimit defense have merit, which warrants summary judgment on the other Underwriters' relevant defenses.[73]

## CONCLUSION AND PRAYER

For these reasons, W&T asks the Court to rule that Underwriters are liable for breach of contract and are precluded from relying on their defenses addressed above. W&T also requests such further relief to which it is entitled.

---

[72] *See supra* Parts I and III; *see also* Ex. 15 at 8.

[73] *See supra* Parts II and III; *see also* Dkt. 13 at 13 (¶¶ 1, 2) (Navigators); Dkt. 14 at 13 (¶¶ 1, 2) (New York Marine); Dkt. 15 at 13 (¶¶ 1, 2) (IINA).

Respectfully submitted,

/s/ *Matthew S. Parish*
Fred Hagans
Attorney-in-charge
State Bar No. 08685500
Southern District Bar No. 2457
fhagans@hagans-law.com
HAGANS BURDINE MONTGOMERY
   & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, Texas 77006
Telephone:  (713) 222-2700
Facsimile:  (713) 547-4950

Matthew S. Parish
State Bar No. 24014279
Southern District Bar No. 25140
mparish@tsslawfirm.com
Keith R. Taunton
State Bar No. 19681100
Southern District Bar No. 5372
ktaunton@tsslawfirm.com
TAUNTON SNYDER & SLADE
10370 Richmond Avenue, Suite 1400
Houston, Texas 77042
Telephone:  (713) 961-5800
Facsimile:  (713) 993-2308

OF COUNSEL:

Warren W. Harris
State Bar No. 09108080
Southern District Bar No. 11318
warren.harris@bracewelllaw.com
Jeffrey L. Oldham
State Bar No. 24051132
Southern District Bar No. 924613
jeff.oldham@bracewelllaw.com
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone:  (713) 221-1490
Facsimile:   (713)221-2199

Scott G. Burdine
State Bar No. 03368900
Southern District Bar No. 10148
sburdine@hagans-law.com
William G. Hagans
State Bar No. 24055612
Southern District Bar No. 695531
whagans@hagans-law.com
HAGANS BURDINE MONTGOMERY & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, Texas 77006
Telephone:  (713) 222-2700
Facsimile:  (713) 547-4950

**Attorneys for Plaintiff W&T Offshore, Inc.**

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing has been served on all parties and/or their counsel of record pursuant to the filing requirements of the Federal Rules of Civil Procedure, on this the 3rd day of October 2016.

/s/ *Matthew S. Parish*
Matthew S. Parish

## **EXHIBITS**

Exhibit 1      Policy No. MS-S 2774 (January 2009 Policy)

Exhibit 2      Initial Advice to Policy No. MS-S 2774.

Exhibit 3      Policy No. MS-S 2812 ("Energy Package")

Exhibit 4      Eighteenth and Final Report to Policy No. MS-S 2812

Exhibit 5      Fifth and Final Report to Policy No. MS-S 2775

Exhibit 6      First Report to Policy No. MS-S 2812

Exhibit 7      Status Advice of 22 April 2015 to Policy No. MS-S 2775

Exhibit 8      Deposition of Todd Grabois

Exhibit 9      Deposition of Paul Ferguson (January 8, 2016)

Exhibit 10    Oct. 25, 2008 Email from C. O'Connor to R. Carvell

Exhibit 11    Deposition of Pete Krouse

Exhibit 12    Lillehammer Terms of Engagement

Exhibit 13    Nov. 6, 2008 Initial Advice to 2775; First Report to 2775; Second Third
               Report; Feb. 28, 2011 Status Advice; June 22 2011 Status Advice; Sept.
               30 2011 Status Advice; Feb. 27 2012 Status Advice; Fourth Report

Exhibit 14    Deposition of Paul Ferguson (July 15, 2016)

Exhibit 15    Feb. 25, 2014 Email from R. Carvell to P. Krouse

Exhibit 16    Fifth Report to Policy No. MS-S 2776

Exhibit 17    NTL #2010-G05, Decommissioning Guidance for Wells and Platforms

Exhibit 18    Nov. 26, 2008 MMS News Release